UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE PASSALACQUA,                      )   CASE NO. CV 12-2430 AG (FFM)
                                       )
                    Petitioner,        )
                                       )   ORDER ACCEPTING FINDINGS AND
            v.                         )   RECOMMENDATIONS OF UNITED
                                       )   STATES MAGISTRATE JUDGE
CONNIE GIPSON, WARDEN,                 )
                                       )
                    Respondent.        )
                                       )

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, records on file, and the Report and Recommendation of United States Magistrate Judge. Further, the Court has engaged in a *de novo* review of those portions of the Report to which Petitioner and Respondent have objected.

Petitioner's arguments regarding the resolution of his first claim for relief are sufficiently addressed in the Magistrate Judge's Report. Petitioner's arguments as to his other claims, however, warrant further discussion. Those arguments are addressed in turn below.

**A.     Claims Two and Three**

Petitioner asserts that the Magistrate Judge erred in applying 28 U.S.C. § 2254(d) to Petitioner's second and third claims for relief because the state courts rejected neither claim on the merits. Instead, pursuant to the look through doctrine, the

/ / /

1  state courts rejected those claims because Petitioner could have raised them, but failed

2  to raise them, on direct review.  (*See* Amended Petition, Exh. F.)

3      Petitioner is correct that the state courts did not reject either claim two or claim

4  three on the merits.  Nevertheless, neither claim warrants habeas relief because, even

5  under *de novo* review, both claims fail.[1]  As to the second claim for relief – that the trial

6  court failed to adequately address allegations of juror misconduct – Petitioner cannot

7  show that the trial court erred.  The Supreme Court has held that the remedy for

8  allegations of jury misconduct is a hearing in which the trial court determines the

9  circumstances of what transpired, the impact on the jurors, and whether or not it was

10 prejudicial.  *Smith v. Phillips*, 455 U.S. 209, 216, 102 S. Ct. 940, 945, 71 L. Ed. 2d 78

11 (1982) (citing *Remmer v. United States*, 347 U.S. 227, 229-30, 74 S. Ct. 450, 98 L. Ed.

12 654 (1954)).  An evidentiary hearing, however, is not mandated every time there is an

13 allegation of jury misconduct.  *See*, *e.g.*, *Tracey v. Palmateer*, 341 F.3d 1037, 1044-45

14 (9th Cir. 2003).  Rather, in determining whether to hold a hearing into an allegation of

15 juror misconduct, courts consider the content of the allegations, the seriousness of the

16 alleged misconduct or bias, and the credibility of the source.  *See Hard v. Burlington*

17 *N.R.R.*, 812 F.2d 482, 485 (9th Cir. 1987).

18     Here, as set forth in the Report, the trial court called Petitioner's father, the

19 person who witnessed the misconduct by the potential jurors, to testify about the

20 misconduct that he had witnessed.  When asked if any of the jurors whom he had

21

22

23 [1]  Respondent did not argue that Petitioner's second and third claims for relief are
   procedurally barred.  Had Respondent done so, the Court would have found that, in

24 fact, the claims were barred.  However, because Respondent did not assert a procedural
   bar challenge and because of the stage at which these proceedings stand, the Court

25 declines to find *sua sponte* that the claims are procedurally barred.  *See Vang v.*

26 *Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003) (holding that district court erred in *sua*
   *sponte* raising procedural default based on petitioner's failure to assert claims on direct

27 appeal where district court raised bar after State had filed lengthy response to petition

28 without asserting procedural bar as affirmative defense).

witnessed engaging in misconduct were still seated on the panel, Petitioner's father without any equivocation informed the trial court that only two of the jurors whom he had witnessed discussing Petitioner's guilt remained on the panel.  (Aug. RT at 178.) The trial court then questioned the jurors that Petitioner's father identified.  After doing so, the trial court removed both jurors from the jury panel, even though one of the jurors denied engaging in any misconduct.[2]  Although Petitioner asserts that the trial court should have conducted a more thorough hearing into the allegation of juror misconduct, he cites no viable reason why additional steps were necessary.  Indeed, Petitioner's father unequivocally identified the only two jurors on the panel who had discussed Petitioner's guilt, and those jurors were removed.  Given that fact, Petitioner simply cannot show that the hearing that the trial court conducted was in any way inadequate. Accordingly, even under *de novo* review, this claim does not entitle Petitioner to habeas relief.

As to Petitioner's third claim for relief – that the instruction regarding a possible second assailant deprived him of his right to a fair trial – habeas relief is unwarranted because the claim is meritless.  Petitioner takes issues with the following instruction:

> The evidence shows that another person may have been
> involved in the commission of the crimes charged against
> the defendant.  There may be many reasons why someone
> who appears to have been involved might not be a
> co-defendant in this particular trial.  You must not
> speculate about whether that other person has been or
> will be prosecuted.  Your duty is to decide whether the
> defendant on trial here committed the crimes charged.

---

[2]  Notably, defense counsel, over objections by the prosecutor, argued that the juror who denied any wrongdoing was lying.  Presumably accepting defense counsel's argument, the trial court removed the juror in question.

(RT 1561.)  According to Petitioner, this instruction effectively told the jury that it could not consider Petitioner's defense that the victim had fabricated the second assailant.

Where a habeas claim rests on an alleged constitutional error arising from a jury instruction,  the question is whether an alleged instructional error "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 70-71(citing *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).  The challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146-147.  "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S. Ct. 1830, 158 L. Ed. 2d 701 (2004) (*per curiam*) (citations and internal quotation marks omitted).  Moreover, even if instructional error is found to rise to the level of a constitutional violation under this standard, federal habeas relief is unavailable unless "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

Here, even under *de novo* review, there is no reason to believe that the jury applied the challenged instruction in a way that violated the Constitution.  The instruction says nothing about whether the jury could consider Petitioner's defense that there was no second assailant.  Indeed, the instruction does not even state that there was a second assailant; rather, it says that the evidence shows that there may have been a second assailant.  That aspect of the instruction is altogether proper in light of the victim's testimony.  And, the court's use of the word "may" carries the inherent – and equally reasonable – possibility that there may not have been a second assailant.  In other words, the jury had to decide if there were a second assailant.  It is equally clear

that the portion of the instruction admonishing the jury not to consider whether the second assailant would or had been prosecuted was applicable only if the jury, in fact, believed that there was a second assailant.  The balance of the instruction was directed at focusing the jury's deliberations on the critical  matter at issue – whether or not Petitioner was guilty.  Taken in context, there is simply no reason to believe that the jury understood the challenged instruction in the manner advanced by Petitioner.

Moreover, the Court notes that Petitioner's reading of the instruction is further undermined by defense counsel's closing argument, in which he explicitly and repeatedly argued that the evidence showed that the victim was lying about the existence of a second assailant.  (*See*, *e.g.*, RT 1605 ("How did it get from being three Hispanics, to two, to one, to 'they,' to 'him'?  It doesn't make sense.  It's a story.  It is a story."); *id.* at 1608-09 ("But here's the problem with the story.  The story is still 'they.'  This story turns on evidence on there being two guys.  There is no evidence in the photographs of two guys.  There is no fingerprint evidence for you.  There is no forensic evidence for you . . .  There is no evidence for you, other than came from out of [the victim's] own words, and [the victim] demonstrably has told story after story after story.").)  Indeed, defense counsel argued that the victim had fabricated nearly every aspect of her account of the rape because she regretted her consensual decision to pose for the erotic photographs found on Petitioner's camera.  In light of the entirety of the instructions and defense counsel's argument, the challenged instruction did not deprive Petitioner of his right to a fair trial or of any other constitutional right to which he was entitled.  Accordingly, habeas relief is not warranted as to this claim.

**B.    Claim Four**

Petitioner contends that the Magistrate Judge misinterpreted Petitioner's fourth claim for relief – namely, that defense counsel provided ineffective assistance of counsel by failing to present testimony regarding the following two issues: (1) how the victim's use of Lexapro, a depression medication, may have affected her perception and actions; and (2) how the victim falsely testified that there was a lock on Petitioner's

1    bathroom door.  As to the testimony regarding the victim's Lexapro use, Petitioner
2    believes that expert testimony would have shown that people taking Lexapro might
3    engage in impulsive behavior and suffer from delusions.  That testimony, according to
4    Petitioner, would have offered the jury an explanation for why the victim consented to
5    pose for the photographs found on Petitioner's camera.  Alternatively, Petitioner posits
6    that the jury may have believed that the victim's Lexapro use may have caused her to
7    believe that the rape occurred, when in fact she was simply delusional.  As to the
8    testimony regarding the lock on Petitioner's bathroom door, Petitioner believes that it
9    would have contradicted a key aspect of the victim's account of the rape.  Specifically,
10   offering testimony that the bathroom door had no lock would undermine the victim's
11   testimony that, during the rape, she locked herself in the bathroom for some period of
12   time.

13          The Magistrate Judge's Report, according to Petitioner, misconstrued the import
14   of the proposed testimony on the victim's Lexapro use by conflating it with the
15   proposed testimony of Dr. Plotkin, the expert who sought to testify about how the
16   victim's self-cutting and other traits and activities impacted her credibility.  (*See* Report
17   and Rec. at 25.)  Specifically, Petitioner faults the following reasoning in the Magistrate
18   Judge's Report:

19                 Petitioner further argues that trial counsel should have
20                 admitted evidence that Ashley was taking the
21                 antidepressant Lexapro and submits the declaration of a
22                 psychologist who indicates that Lexapro can cause an
23                 individual to act out of character or become delusional.
24                 However, counsel attempted to admit evidence of
25                 Ashley's psychiatric history through the testimony of the
26                 expert psychiatrist, discussed in Section A, above.  The
27                 trial court found the expert testimony inadmissible, in
28                 part, because it would cause confusion and consume too

1    much time.  The trial court explained that a mini-trial

2    would have to be conducted to establish the extent of

3    Ashley's psychiatric problems and the treatment she had

4    received.  Counsel could not have believed the trial court

5    would have been more receptive to evidence of Ashley's

6    psychiatric medications, particularly where the admission

7    of such evidence would have required the defense to

8    establish not only that Ashley was taking Lexapro and

9    that Lexapro can cause the side effects described, but also

10    that Ashley personally experienced those side effects.

11 (*Id.*)  Petitioner complains that the Magistrate Judge mistakenly assumed that

12 Petitioner's expert psychiatrist, Dr. Plotkin, intended to offer any testimony about the

13 victim's Lexapro use.  According to Petitioner, Dr. Plotkin proposed to testify only

14 about how the victim's self-cutting and facts related to her sexual activity impacted her

15 credibility.  Dr. Plotkin never mentioned the victim's Lexapro use or how her use of

16 Lexapro might have impacted her actions or her perception on the facts and events

17 underlying Petitioner's conviction.  Accordingly, Petitioner believes that the Magistrate

18 Judge's analysis is misguided.

19       There is some merit to this aspect of Petitioner's objection.  But as explained

20 below, even properly construed, Petitioner's claim does not entitle him to habeas relief.

21 First, Petitioner did not suffer cognizable prejudice from defense counsel's failure to

22 present evidence regarding the victim's medication use.  The thrust of Petitioner's

23 argument is that expert testimony regarding Petitioner's use of Lexapro would have

24 explained why she acted out of character and possibly hallucinated the entire rape.

25 There are, however, several reasons to believe that this proposed testimony would not

26 have impacted the jury's verdict.  Most importantly, no testimony was offered to show

27 that the victim was actually taking Lexapro or, if she had been taking it, how often she

28 took it.  Instead, the record shows, at best, that she was prescribed Lexapro three weeks

1  before the rape occurred.  Thus, the evidence regarding the victim's purported Lexapro

2  use would unlikely have been admissible.  *See People v. Panah*, 35 Cal. 4th 395, 478,

3  25 Cal. Rptr. 3d 672, 107 P.3d 790 (2005).  And, even if Petitioner could establish that

4  the victim took Lexapro as prescribed and the expert testified that impulsive behavior

5  and delusions are associated with Lexapro use, the expert's testimony would have

6  supported only the possibility that the victim experienced those side effects.  The jury,

7  moreover, would have been unlikely to accept that possibility considering that the

8  prosecution would have been able to present expert testimony showing that

9  hallucinations and delusions are exceedingly rare occurrences for those taking

10 Lexapro.[3]  Indeed, according to one study, only 1.2% of people taking Lexapro

11 experience hallucinations.[4]  Thus, in addition to establishing that the victim took

12 Lexapro, defense counsel would still have to overcome the hurdle of showing that the

13 victim was one of the few people who become delusional when taking the medication.

14 Nothing in the expert's report, however, could establish either as a fact.

15      Regardless, as is evident from the preceding paragraph, the proposed line of

16 testimony would have devolved into a mini trial about not only whether and to what

17 extent the victim used Lexapro, but also as to the number of Lexapro users who

18 experience delusions and impulsive behavior, under what conditions they experience

19 those effects, the severity of their impulsiveness and delusions, the likelihood that the

20 victim, herself, experienced those effects, and the extent to which she experienced them.

21 Given that fact, there is little reason to believe that the trial court would have

22

23

24

25 [3]  *See*, *e.g.*, http://www.drugs.com/sfx/lexapro-side-effects.html, last visited on July

26 30, 2014.

27 [4]  *See* http://www.ehealthme.com/ds/lexapro/hallucinations, last visited on July 30,

28 2014.

1  allowed this line of testimony, as the court already had evidenced a clear aversion to

2  allowing testimony that would lead to such mini trials. (*See* Report at 13.)

3      Moreover, the likelihood that the jury would believe that the victim was one of

4  the rare number of people to experience delusions or hallucinations under Lexapro – let

5  alone that she suffered delusions severe enough to make her believe that she had been

6  raped – was minimal considering the substantial evidence corroborating her account of

7  the facts.  For example, the photographs in Petitioner's camera corroborated her account

8  of how she was forced to pose for erotic photographs.  Additionally, Petitioner's

9  landlord – an unbiased third party – corroborated an aspect of the victim's testimony in

10  that the landlord saw a young woman leaving with Petitioner around the time that the

11  victim said that she was led from Petitioner's home.[5]  And, according to the landlord,

12  the girl was crying so loudly that her crying "startled" the landlord.  Put simply, there is

13  no question that the victim was at Petitioner's home and that there were photographs

14  taken of her in erotic poses and performing fellatio upon Petitioner.  Given this

15  evidence, the jury would not have been inclined to believe that she was delusional.

16  Rather, it had to decide whether she was being truthful about the sexual assault or

17  simply fabricating a story to cover up for a decision that she immediately regretted.

18  Nothing in the expert's report, however, establishes a correlation between Lexapro use

19  and credibility or lack thereof.  Consequently, there is no reason to believe that, but for

20  the lack of evidence regarding the victim's purported use of Lexapro, the jury would

21  have reached a verdict other than the one it actually reached.

22

23

24

_____

25  [5]   The Court acknowledges that the victim testified that she exited the home with

26  Petitioner and the second assailant, whereas the landlord testified that she saw no one

27  other than Petitioner and the young woman who was crying.  Although this
   inconsistency might undermine the victim's account of the assault, it in no way

28  suggests that the victim was delusional.

Second, Petitioner cannot show prejudice with respect to counsel's failure to present testimony that Petitioner's bathroom door had no lock.  To be sure, testimony that the door had no lock would appear to be at odds with the victim's testimony that she locked herself in Petitioner's bathroom.  Moreover, Petitioner has submitted three declarations from friends and family who were all willing to testify that the door had no lock.  Nevertheless, testimony on this point would have been unlikely to have appreciably swayed the jury for several reasons.  To begin, the record shows that, if Petitioner presented the proposed testimony, the existence of the door lock nevertheless would have been a contested issue.  Although Petitioner's friends and family were willing to testify that there was no lock, the prosecutor would have been able to present testimony from two objective third party witnesses that the door, in fact, had a lock.  Specifically, the record shows that Petitioner's former landlord, in response to inquires from Petitioner's father, informed the prosecutor that the door had a lock.  The landlord also informed the prosecutor that he had confirmed this fact by "distub[ing]" her tenant.  (RT 1584.)  Thus, if Petitioner's friends and family testified that there was no lock on the door, the prosecutor in all likelihood would have called the landlord and the tenant to show that Petitioner's witnesses were either mistaken or lying.  Although there is no way to know for sure whom the jury would have believed, it is nevertheless significant that Petitioner's proposed witnesses were his friends and family, whereas the prosecution's witnesses would have been objective third parties.  Given that fact, Petitioner's witnesses were open to a credibility attack to which the prosecutor's witnesses would have been immune.  *See Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir. 1995) (testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"); *see also Bergman v. Tansy*, 65 F.3d 1372, 1380 (7th Cir. 1995) (counsel was not ineffective for failing to call family members who would have easily been impeached for bias).

/ / /

/ / /

1    Furthermore, the jury could have reconciled the victim's testimony with the
2    proposed testimony. Indeed, although the victim testified that she had locked herself in
3    the bathroom, she also testified that, while she was in the bathroom, she held onto the
4    door handle. Faced with this testimony, the jury might have believed that she simply
5    mis-spoke about locking the door, when, in fact, she meant that she had barricaded
6    herself in the bathroom.

7    More importantly, even if the jury would have believed Petitioner's proposed
8    witnesses, there is no reason to conclude that the jury would have rejected the victim's
9    credibility in light of the testimony regarding the lack of a door lock. Indeed, the jury
10   already had heard far more compelling inconsistencies and factually incorrect
11   statements in the victim's story than that at issue in the proposed testimony about the
12   door. For example, the victim initially told her boyfriend and police that she had been
13   "pulled into [Petitioner's] car," when, in fact, she later admitted that she had voluntarily
14   entered the car. Another major inconsistency in the victim's accounts of the abduction
15   was the number of people involved. Initially, she reported that three Hispanic men had
16   forced her into the car. Later, however, the number of men involved shrunk to two,
17   and, of course, she recanted her story of being forced into the car. She also offered
18   inconsistent accounts of the sequence of events. For example, she initially stated that
19   her assailants had first forced her to take erotic photographs and then repeatedly raped
20   her. At trial, however, her account of the events was the opposite, with the rapes
21   occurring first and the photographs occurring afterwards. In terms of whether her
22   assailants used condoms, she again offered differing accounts. At the preliminary
23   hearing, she unequivocally testified that neither of her assailants wore a condom. By
24   contrast, she testified at trial that she could not remember whether or not either of the
25   assailants wore a condom.

26   Perhaps the biggest inconsistencies in the victim's accounts of the rape were her
27   dramatically shifting versions of how she left Petitioner's home. Initially, she told
28   police that she had locked herself in the bathroom and then escaped through the

bathroom window.  But when she was confronted by the fact that the bathroom had no window, she admitted that she had actually left through the front door, following Petitioner to his car.  Considering that the jury did not reject the victim's credibility after learning of the foregoing inconsistencies in the victim's accounts, there is simply no reason to believe that impeaching her testimony about the door would have persuaded the jury to do so.  Indeed, the purported lie about the door lock is surely no worse than – and, in fact, is more innocuous than – the victim's flat out factually false statement about escaping through a non-existent window.  And, the jury was aware that the victim had made false statements about several other aspects of the facts underlying Petitioner's conviction.  Consequently, that the jury may have believed that she lied about the bathroom door having a lock unlikely would have caused the jury to disbelieve her testimony about being raped.

Moreover, even before one can entertain the question of whether the jury would have found the proposed testimony about the door lock compelling enough to reject the victim's credibility, one must first assume that the jury would have concluded that, in fact, the door did not have a lock.  But, as explained above, that proposition was a dubious one at best, considering the source of the proposed testimony and the witnesses whom the prosecution likely would have called to rebut the proposed testimony.

In sum, the victim was far from an ideal witness, and the jury was well equipped to find that she lacked credibility if it was in any way inclined to do so.  Indeed, given the lack of any physical evidence of rape, the victim's shifting accounts of the rape, and her outright falsehoods, it would have been unsurprising if the jury had rejected her credibility.  But, as evidenced by its verdict, the jury believed that the victim had been raped by Petitioner.  Given this fact, it is unlikely that the jury would have reached a verdict more favorable to Petitioner than the one it actually reached had the jury heard (and believed) the proposed testimony about the door lock.  The same is true with

/ / /

1   regards to the proposed testimony about the victim's purported use of Lexapro.

2   Accordingly, habeas relief is not warranted as to this claim.

3          The Court, therefore, accepts the findings and recommendations of the Magistrate

4   Judge.

5

6   DATED: September 30, 2014

7   _____

8                        ANDREW J. GUILFORD
                         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28